[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
FINDINGS, DISCUSSION OF LAW AND CONDITIONS OF RELEASEINTRODUCTION
INTRODUCTION
By its judgment dated January 27, 1995 ("dissolution judgment"), this court (Santos, J.) dissolved the marriage of the parties. The dissolution judgment contained the following findings, inter alia:
 1) The defendant ("Ms. Wiegand") was then receiving: $1,042 per month from Social Security in disability payments; $2,707 per month from Cigna in disability benefits; and, $1,711.08 per month from Northwestern Mutual Life Insurance ("NWM") in disability benefits;
2) Ms. Wiegand's gross annual income was then $73,042;
 3) There was one child issue of the parties' marriage, and Ms. Wiegand had another child as to whom paternity had not been established (collectively "children");
4) Ms. Wiegand was then receiving $580 per month from CT Page 1525 Social Security for the benefit of the children;
 5) As of January 9, 1995, Ms. Wiegand was in arrears on payments to the plaintiff ("Mr. Wilkinson") under pendente lite orders, as follows: child support, $1,079.04; alimony, $1,904.48; and, Social Security benefits received by her for the benefit of the children, $3,131.76. The total of all pendente lite arrearages was $6,879.69;
 6) Ms. Wiegand had not paid to Mr. Wilkinson $25,000 in counsel fees, as directed by pendente lite order;
 7) Mr. Wilkinson had been awarded pendente lite custody of the children, and Ms. Wiegand had interfered with that custodial arrangement by removing the children; and,
 8) Ms. Wiegand was in contempt of the pendente lite orders concerning custody, child support and counsel fees.
The dissolution judgment contained the following orders,inter alia:
 1) Custody of the children was awarded to Mr. Wilkinson;
 2) Ms. Wiegand was ordered to pay child support to Mr. Wilkinson of $372.94 per week, and an execution was issued directing Cigna to pay to Mr. Wilkinson $238.06 per week from Ms. Wiegand's disability benefits;
 3) Ms. Wiegand was ordered to pay alimony to Mr. Wilkinson of $391.47 per week for five years or until the children were returned to Mr. Wilkinson, whichever was sooner;
4) The following order was entered, verbatim:
 "The court has reviewed the criteria as enumerated in Section 46b-81, and, in addition to the real estate and personal property hereby awards the Plaintiff:
 $500,000.00, payable at the rate of $20,000.00 per year with interest at the rate of 8 per cent per year. CT Page 1526 of particular note is the intolerable cruelty which the Defendant has caused by subjecting the Plaintiff to false allegations of sexual abuse, and the humiliation which resulted from that, and by depriving the Plaintiff any contact with the children for over 26 months. Since the court does not know when the children shall be returned to the Plaintiff, if ever, the court has set the award taking into consideration the fact that the aforesaid cruelty may continue indefinitely. However, if the children are turned over to the Plaintiff by midnight of July 1, 1995 then the court shall, (with Plaintiff's consent) remit the lump sum alimony award to $250,000.00 payable at $12,500.00 on each and every July 1, until paid (together with interest at the rate of 8 per cent per year, compounded).";
 5) Ms. Wiegand was ordered to pay counsel fees of $16,000 to Attorney Judith Benedict, counsel for the children; and,
 6) Ms. Wiegand was ordered to pay counsel fees of $25,000 to Mr. Wilkinson's attorney, in addition to the counsel fees of $25,000 which had ordered pendente lite as to which Ms. Wiegand had been found in contempt.
Thereafter, an appeal was filed with the Appellate Court from the dissolution judgment on behalf of Ms. Wiegand. By its order of July 12, 1995, the Appellate court granted Mr. Wilkinson's motion to dismiss that appeal.
Under date of November 6, 1996, Mr. Wilkinson filed a motion for contempt against Ms. Wiegand. Under date of November 8, 1996, Attorney Benedict filed a motion for contempt against Ms. Wiegand. Those two motions alleged that Ms. Wiegand was in contempt of the dissolution judgment's orders concerning child support, alimony, lump sum alimony and attorneys' fees. Hearings were conducted by the court in connection with those motions on December 3, 1996 and December 11, 1996. At the end of the December 11, 1996 hearing, the court found Ms. Wiegand in wilful contempt of those orders and committed her to the custody of the Commissioner of Corrections until she purged herself. A purge bond was set in the amount of $30,000. Thereafter, hearings were held on each of the following dates, pursuant to Section 528A of the Practice Book, to determine if Ms. Wiegand had complied with CT Page 1527 the orders of which she had been found in contempt and/or to give her an opportunity to establish that she did not then have the ability to purge herself: January 8, 1997, February 5, 1997, February 7, 1997 and February 18, 1997. From the evidence taken at those six hearings, the following findings have been made, some of which have not previously been articulated by the court:
 1) The orders contained in the dissolution judgment which are described or set out above are valid and outstanding;
 2) Ms. Wiegand has not moved to open or modify the dissolution judgment;
 3) As stipulated by the parties, Ms. Wiegand has paid no part of the arrearage established by the dissolution judgment as having been due from her to Mr. Wilkinson under the pendente lite orders in the amount of $6,879.69;
 4) As stipulated by the parties, as of December 11, 1996, there was an arrearage due from Ms. Wiegand to Mr. Wilkinson under the dissolution judgment of $9,027.24 in child support payments, $29,360.25 in alimony payments and $50,000 in attorney's fees;
 5) As stipulated by the parties, there is an arrearage due from Ms. Wiegand to Attorney Benedict under the order of the dissolution judgment concerning attorney's fees for counsel for the children in the amount of $9,700;
 6) As of December 11, 1996, there was an arrearage due from Ms. Wiegand to Mr. Wilkinson under the order of the dissolution judgment concerning lump sum alimony in the amount of one year's installment, $20,000, together with one year's interest of $40,000 (calculated at eight per cent per annum on the entire lump sum alimony obligation of $500,000, totalling $60,000 in principal and interest;
 7) From the date of the dissolution judgment until December 11, 1996, no money was paid by Ms. Wiegand to Mr. Wilkinson pursuant to the dissolution judgment, other than what was paid by Cigna to him pursuant to the CT Page 1528 execution;
 8) As Ms. Wiegand testified, in 1988 she fell down a flight of stairs and herniated a disc, and since that time she has been disabled and has not worked;
 9) In 1987, the last full year during which Ms. Wiegand worked, her income was $98,000;
 10) Ms. Wiegand has a bachelor's degree from Marquette University, and she has done graduate work towards a master's degree in business from Northeastern University;
 11) At the time of her fall, and continuously from then to the present, Ms. Wiegand has enjoyed disability insurance coverage from Cigna pursuant to which she is entitled to receive approximately $2,700 per month in taxable benefits when she is disabled;
 12) At the time of her fall, and continuously from then to the present, Ms. Wiegand has enjoyed disability insurance coverage from NWM pursuant to which she is entitled to receive approximately $1,800 per month in non-taxable benefits when she is disabled;
 13) For the entire period from the date of the dissolution judgment until December 1995, Cigna disbursed approximately $2,00 per month in taxable benefits in respect of Ms. Wiegand's disability insurance. During at least some portion of that period, it paid $1,350 per month to Ms. Wiegand and $1,350 per month, pursuant to the execution, to Mr. Wilkinson. Cigna may have paid the entire $2,700 per month to Ms. Wiegand during some portion of that period. In any event, Ms. Wiegand received at least $1,350 per month from Cigna during that entire period;
 14) From the date of the dissolution judgment until November 1996, NWM paid Ms. Wiegand approximately $1,800 per month in non-taxable disability benefits;
 15) From the date of the dissolution judgment until November 1996, Social Security paid Ms. Wiegand approximately $1,200 per month in disability benefits;
CT Page 1529
 16) Ms. Wiegand failed to make out a prima facie case that, from the date of the dissolution judgment until December 1995 (after which Cigna suspended benefits to Ms. Wiegand as found hereafter), she was unable to pay at least some portion of the arrearages found in Findings 3 through 6, as they became due during that period;
 17) By clear and convincing evidence it was established that, from the date of the dissolution judgment until December 1995, Ms. Wiegand received disability benefits of approximately $4,350 per month which was sufficient, after adjustment for taxes, to permit her to pay at least some portion of the arrearages found in Findings 3 through 6, as they became due during that period;
 18) Ms. Wiegand failed to make out a prima facie case that, from January 1996 until December 11, 1996 (the date on which Ms. Wiegand was committed to coercive incarceration), she was unable to pay at least some portion of the arrearages found in Findings 3 through 6, as they became due during that period;
 19) By clear and convincing evidence it was established that, from January 1966 until December 11, 1996, Ms. Wiegand received disability benefits of approximately $3,000 per month which was sufficient to permit her to pay at least some portion of the arrearages found in Findings 3 through 6, as they became due during that period;
 20) Cigna, NWM and Social Security (collectively, "payors" and individually "payor") require that Ms. Wiegand periodically reestablish that she continues to be disabled in order to remain entitled to receive disability benefits;
 21) Cigna suspended the payment of disability benefits to Ms. Wiegand after December 1995, because, in spite of repeated requests of her by Cigna, she had not supplied to Cigna any of the following:
 A narrative report from the physician or physicians who had treated her;
Copies of office notes from each such CT Page 1530 physician;
 Copies of reports of any testing performed on her;
 A report of a functional capabilities evaluation; and,
 A report from a Dr. Ford, who examined Ms. Wiegand;
 22) Ms. Wiegand has been treated for her disability by Dr. Gordon Ahlers of Burlington, Vermont;
 23) As Ms. Wiegand testified, she now has the ability to obtain from Dr. Ahlers whatever medical records are required by any of the payors without her having to travel to Vermont; (T, 2-5-97, P90)
 24) Upon receipt of the materials described in Finding 21, Cigna will advise Ms. Wiegand whether it will require that she be examined by a physician before it decides whether to reinstate her disability benefits;
 25) The court has stated, on the record, that if Cigna requires such a medical examination, the court will attempt to make any arrangements necessary to permit such an examination, either where Ms. Wiegand is now being held or elsewhere;
 26) As of February 7, 1997, Ms. Wiegand had not discussed with her current attorney, Attorney Diane Polan, those things which she had to do in order to get Cigna to reinstate her disability benefits;
 27) Ms. Wiegand has failed to make out a prima facie case that, since December 11, 1996, she has not had the ability to arrange, by herself or through someone authorized by her and acting on her behalf, to provide to Cigna the materials described in Finding 21 without which Cigna will not make a determination whether to reinstate her disability benefits;
 28) By clear and convincing evidence it was established that since December 11, 1996, Ms. Wiegand has had the CT Page 1531 ability to arrange, by herself or through someone authorized by her and acting on her behalf, to provide to Cigna the materials described in Finding 21, without which Cigna will not make a determination whether to reinstate her disability benefits;
 29) NWM suspended the payment of benefits to Ms. Wiegand after November 1996, because it required, but had not received, copies of her doctor's records and an evaluation, and NWM so notified Ms. Wiegand;
 30) Ms. Wiegand has failed to make out a prima facie case that, since December 11, 1996, she has not had the ability to arrange, by herself or through someone authorized by her and acting on her behalf, to provide to NWM the materials described in Finding 29 without which NWM will not make a determination whether to reinstate her disability benefits;
 31) By clear and convincing evidence it was established that, since December 11, 1996, Ms. Wiegand has had the ability to arrange, by herself or through someone authorized by her and acting on her behalf, to provide to NWM the materials described in Finding 29 without which NWM will not make a determination whether to reinstate her disability benefits;
 32) Cigna and NWM may reinstate disability benefits to Ms. Wiegand if she provides to them the medical records they require, and if she cooperates in undergoing a medical exam, if they request one. If either Cigna and/or NWM does reinstate disability benefits, Ms. Wiegand would then enjoy a resource which could be used by her to purge, partially, her contempt. In addition, a reinstatement of benefits may result in a lump sum payment or payments to Ms. Wiegand of retroactive benefits in respect of the period during which benefits have been suspended, which could also be used by her to purge, partially, her contempt;
 33) In November 1996, Social Security advised Ms. Wiegand that her benefits were being suspended until she submitted to an independent medical evaluation. Ms. Wiegand has appealed that suspension of benefits and, pending the conclusion of that appeal, Social Security CT Page 1532 is continuing to issue monthly checks to Ms. Wiegand;
 34) According to a representation made to the court on February 7, 1997 by Ms. Wiegand's attorney, Attorney Diane Polan, Social Security has forwarded checks for December 1996 and January 1997 to Ms. Wiegand, each for $1,200, to a Post Office box in Nebraska to which one of her attorneys, Senator John DeKamp of Lincoln, Nebraska, has a key, and those checks are still in that Post Office box;
 35) Ms. Wiegand has failed to make out a prima facie case that she has not had the ability to arrange, by herself or through someone authorized by her and acting on her behalf, to obtain possession of the checks described in Finding 34 which could be used by her to purge, partially, her contempt;
 36) By clear and convincing evidence, it was established that Ms. Wiegand has the ability to arrange, by herself or through someone authorized by her and acting on her behalf, to obtain possession of the checks described in Finding 34 which could be used by her to purge, partially, her contempt;
 37) Ms. Wiegand said to Donna Dragan, at a time when Donna Dragan was a close friend and confidante of hers, that she would give up her disability benefits before she would let Mr. Wilkinson get any of them;
 38) Cigna requested an independent medical exam of Ms. Wiegand by a Dr. Ford of Burlington, Vermont. In regard to that exam, Ms. Wiegand stated in a letter to Cigna:
 "I have also seen Dr. Ford in Burlington, Vt. for a full disability eval — her records can be obtained directly — below is a release. The only thing I did not do for her was fully undress because I am concerned for my safety for obvious reasons." (Children's Ex. A, 2-5-97)
 39) The medical records required by the payors cannot be provided to them unless Ms. Wiegand provides them, or arranges to have them provided, and if a medical exam CT Page 1533 of Ms. Wiegand is required by one or more of the payors, it cannot be conducted without her cooperation;
 40) Throughout her incarceration, Ms. Wiegand has had the ability to provide, or to have provided, to each of the payors all medical records required by the payors, and to undergo a medical exam, if requested by one or more of the payors, in order to allow each of the payors to decide whether to reinstate her disability benefits. Because Ms. Wiegand does not want Mr. Wilkinson to receive any portion of her disability benefits, she has refused to provide, or to have provided, to the payors those records, and she has refused to cooperate in the conduct of a medical exam of her;
 41) Ms. Wiegand has provided to Mr. Wilkinson's attorney an assignment of $30,000 from any disability benefits due to her from Cigna. However, it is not clear if the form of that assignment complies with federal requirements. More importantly, that assignment is worthless unless and until Cigna reinstates benefits, which will not occur unless and until there is provided to Cigna the materials described in Finding 21, and if Cigna requests a medical exam of Ms. Wiegand, until she cooperates in such an exam;
 42) Fund raising efforts have been conducted for Ms. Wiegand by Senator John DeKamp and Bo Gritz;
 43) Since June 1996, at least the following amounts have been paid on Ms. Wiegand's behalf to the following persons (where known, the person making the payment is indicated):
 To Whom Paid Amount Paid By Whom Paid
Senator John DeKamp $30,000 Unknown
 Atty. John Schoenhorn $2,200 Friends of Ms. Wiegand's family
 Atty. Anthony Colleluori $1,250 Hartford Interval House Ms. Wiegand's sister CT Page 1534 People associated with Gifts of Love Foundation
 Atty. Diane Polan $3,000 Ms. Wiegand's mother
 Bo Gritz $ $1,000 Unknown $37,500
 44) Ms. Wiegand has not received from Senator DeKamp an accounting of the $30,000 received by him, and she has neither asked for nor received from Mr. Gritz an accounting of any money which has been received by him;
 45) On behalf of Mr. Wilkinson, Attorney Louis Kiefer has requested that Ms. Wiegand provide to him authorizations enabling him to learn what money has been raised on Ms. Wiegand's behalf, the purpose for which the money was raised, what disbursements have been made of that money and how much of it is now being held. On February 5, 1997, Attorney Diane Polan, representing Ms. Wiegand, stated to the court: "Ms. Wiegand says she's willing to sign an authorization that Mr. Kiefer can, speak to the people who are doing the fund raising . . ." (T, 2-5-97, P17) Nonetheless, on February 7, 1997, Ms. Wiegand testified that she had provided no such authorization to Mr. Kiefer; (T, 2-7-97, P66)
 46) Senator DeKamp and/or Bo Gritz may be holding money, the expenditure of which Ms. Wiegand has the ability to influence or control, which could be used to purge, partially, her contempt;
 47) As Ms. Wiegand testified, she has used the alias Donna Maloney, she has obtained for herself a second Social Security number in the alias of Donna Maloney and she has registered a car under the alias Donna Maloney;
 48) Ms. Wiegand's credibility is low because she has frequently been evasive, misleading and contradictory in answering questions, except when her answers were self-serving. The following are examples of such testimony:
CT Page 1535
 THE COURT: So my question to you is do you believe that CIGNA wants this information so that it can determine for itself whether or not you've been working under any of those aliases?
THE WITNESS: Probably, yes.
 THE COURT: And you have refused to give them authorizations on those aliases?
 THE WITNESS: so sir. I will give them the one that I did use and the others I have never used. So I can't find them.
 THE COURT: All right And so you have refused to give them an authorization on those other aliases?
THE WITNESS: I don't think I've refused, no sir.
 THE COURT: Did they send you a form made out in each of those other aliases?
THE WITNESS: Yes, sir.
 THE COURT: And you didn't sign them and return them to them?
 THE WITNESS: It's pending right now. But we haven't — (T, 12-11-96, Pp 30-31)
. . .
 Q. All right. And the fact is that it has come back, has it not?
A. Not to my knowledge. I have no —
 THE COURT: Ma'am, you've used that phrase many times.
 THE WITNESS: All right, so. No, it has not. (T, 12-11-96, P72)
 Q. January, you have evidence that social security cut you a check. Is that correct?
CT Page 1536
A. I believe my —
Q. Yes or no.
A. I personally do not.
Q. Yes or no.
A. My attorney has said that she —
Q. Yes or no.
A. — believes that it's true.
Q. You have no information as to that?
 ATTORNEY POLAN: Your Honor, I'm going to object to that. I object because he won't let (sic) answer the question.
 THE COURT: Well, he's entitled to a yes or no answer. This is cross examination.
 ATTORNEY POLAN: He asked her whether she has evidence. That was his question.
THE COURT: That's right.
MS. WIEGAND: I don't know.
 THE COURT: Counselor, correct me if I'm wrong. Didn't you represent to the Court before that you had a printout from social security showing that a January check was issued?
 ATTORNEY POLAN: Absolutely. That doesn't mean she has any evidence. She's seen the same document I have, and that's what she's trying to say, your Honor. I don't know what the problem —
 THE COURT: Well, is that not — in your mind, isn't that evidence, I mean, not in a formal sense that it's been introduced —
CT Page 1537
ATTORNEY POLAN: No.
THE COURT: In a court proceeding, but is that
 ATTORNEY POLAN: No, I think — no, your Honor. She has no personal knowledge. She's looked at a printout that I showed her. She has no personal knowledge.
 THE COURT: Counselor, your'e just wasting valuable time.
BY ATTORNEY KIEFER:
 Q. You agree that you have seen a document that seems to suggest that social security sent you a check in January, Is that correct?
A. Yes.
 Q. And you have reason to believe that it was mailed to DeCamp in nebraska —
A. Yes.
 Q. — in January. And you have a post office box in — he's in Nebraska. Right?
A. Right. (T, 2-7-97, Pp. 51-53)
. . .
 THE COURT: Let me understand. You have to submit periodic medical evidence to Northwestern, CIGNA and Social Security in order to continue to get benefits from them?
 THE WITNESS: Yes, sir. And I have been doing that extremely regularly. The problem is that there have been all kinds of third party and anonymous calls as recently what happened with Northwestern is someone called and gave them eight alias names that I have supposed to be using. And so what they did is suspend or canceled my disability insurance, saying that here are a list of names that someone called in to them, CT Page 1538 names that I have never seen in my life, and asked me to file financial releases and credit releases, all kinds of things. (T, 12-11-96, P25)
The testimony of Ms. Wiegand quoted immediately above contradicts the following testimony which she gave as to the reason why NWM suspended her disability benefits:
 Q: All right. Back to the Northwest Mutual. What — do you have an understanding as to why those benefits were terminated.
 A. My understanding is that they need a new med — a doctor's medical records and evaluation. (T, 2-5-97, P31)
THE LAW OF CONTEMPT AS APPLIED TO THE FINDINGS IN THIS CASE
The two elements of a civil contempt finding are well established: the existence of a valid court order and failure by the contemnor to comply with that order. When both of those elements are present, inability of the contemnor to comply with the subject order is available as a defense in a contempt proceeding. Leslie v. Leslie, 174 Conn. 399, 403
(1978).
Clear and convincing evidence is the movant's standard of proof on the elements of civil contempt. However, a contemnor need merely establish a prima facie case on the defense of inability to comply, and the burden then shifts to the movant to prove, by the clear and convincing evidence standard, that the contemnor had the ability to comply.
If the elements of a contempt are found, and if there is no finding that the contemnor is then unable to purge the contempt, the contemnor may be committed to coercive incarceration. After incarceration, a contemnor may seek release on the ground that incarceration has been proven to be an ineffective coercive device. Whether incarceration has, in fact, been proven to be an ineffective coercive device is a question of fact for the court.
In this case, the existence of valid orders and of Ms. Wiegand's failure to comply with those orders are undisputed.[1]
The issues in this case are, therefore, whether Ms. Wiegand CT Page 1539 had the ability to make some or all of the payments ordered in the dissolution judgment ("financial orders") as they became due, and whether, since her incarceration, she has had the ability to purge, at least in part, her contempt.
Ms. Wiegand offered no evidence that, from the entry of the dissolution judgment (January 1995) until her incarceration (December 1996), she was unable to make any payments on the financial orders. To the contrary, the undisputed evidence established that, from the date of the dissolution judgment until December 1995, at the least Ms. Wiegand received approximately $1,350 per month from Cigna in disability benefits[2] (which were taxable), approximately $1,800 per month from NWM in disability benefits (which were non-taxable) and approximately $1,200 per month from Social Security in disability benefits, a total of $4,350 per month. That revenue was certainly sufficient to allow Ms. Wiegand to make at least a portion of the payments for which she was then obligated. Accordingly, her failure to make any voluntary payments during that period constituted wilful contempt.
The undisputed evidence established that from January 1996 through November 1996, Ms. Wiegand received approximately $1,800 per month from NWM in disability benefits (which were non-taxable) and approximately $1,200 per month from Social Security in disability benefits, a total of $3,000 per month. That revenue was sufficient to allow Ms. Wiegand to make at least a portion of the payments for which she was then obligated. Accordingly, her failure to make any payments during that period constituted wilful contempt.
The evidence established that, from the time of her incarceration to the present, the only assets of Ms. Wiegand were two Social Security checks for approximately $1,200 each, each of which was languishing in a Post Office box in Nebraska. However, as stated in Finding 32, by providing, or by arranging to provide, to the payors the medical records which they require, and by cooperating in a medical exam if one is required, Ms. Wiegand may cause to be reinstated a monthly stream of revenues to her of $4,350 as well as, perhaps, a lump sum payment of retroactive benefits, which could be used to purge, in part, her contempt.
As Ms. Wiegand testified, and as stated in Finding 8, she is disabled. As Ms. Wiegand testified, and as stated in CT Page 1540 Finding 23, she has the ability to obtain the required medical records. Accordingly, if she provides, or arranges to provide, the required records, and if she cooperates in a medical exam, if one is required, the payors will likely reinstate her benefits, perhaps even retroactively. It has been Ms. Wiegand's position that to require her to take the steps needed to provide those medical records to the payors is not a reasonable condition for the purging of her contempt. (T, 2-7-97, P37) Further, it is Ms. Wiegand's position that her incarceration for approximately 11 weeks establishes "her inability to purge the contempt through any reasonable means available to her." (T. 2-7-97, P104)
In addition to the potential stream of disability benefits, it is possible that Senator DeKamp and/or Bo Gritz is holding money raised on behalf of Ms. Wiegand, which Ms. Wiegand can now direct. However, that will not be known unless and until Ms. Wiegand executes and delivers to Mr. Wilkinson's counsel authorizations permitting Messrs. DeKamp and Gritz to disclose such matters. Ms. Wiegand has testified that she is willing to execute such authorizations, but has not done so yet.
Ms. Wiegand's situation is quite similar to that of most people who suffer coercive incarceration for failure to comply with financial orders contained in dissolution judgments. That is, she, like most such people, does not have title to assets which are sufficient to allow her to purge. Nonetheless, like most people in her situation, it appears that it may be within her power to acquire or direct such assets.
In irreducible form, the issue is whether, after Ms. Wiegand has been incarcerated for approximately 11 weeks, the court can require her to take the steps necessary to put the payors in a decision-making mode, and to allow disclosure of fund raising activities on her behalf, as conditions for her release.
No Connecticut case dealing with this question has come to the court's attention. However, there is relevant case law from other jurisdictions. In Roberson v. Roberson, 40 N.C. App. 193,252 S.E.2d 237 (1979), the court stated:
Committing a husband to jail for an indefinite CT Page 1541 term, i.e., until he complies with an order for support, is authorized when there is a present and continuing contempt. A present and continuing contempt exists when the husband presently possesses the means to comply, and wilfully fails or refuses to comply. A finding to this effect by the trial judge is necessary to support confinement for an indefinite term.
. . .
 Nevertheless, indefinite confinement for failure to pay alimony or support is not authorized unless there is the finding of present capability to comply. (Citations omitted.) Id, 239.
In Harvey v. Harvey, 384 P.2d 265 (1963), the court stated:
 Clarence's further contention that even though commitment to the county jail be proper, it must be for a term certain and in no event for more than a term of one year, is also without merit. He cites no authority, incidentally, in support of such a limitation upon the contempt powers of a court. Id, 267.
In Heflinger v. Heflinger, 172 Ga. 889, 159 S.E. 242
(1931), the facts were similar to those in this case, and the court stated:
 The evidence discloses that he received from the sale of real estate considerable sums of money. The evidence discloses that he received large income from salaries and commissions as a salesman up to 1923. There is further evidence that the husband had been advised that, if he was committed for contempt for failing to pay alimony to his wife, he would probably be discharged in about three months; and the inference from this fact may be drawn that he preferred temporary confinement in the jail to the payment of large alimony to his wife. The evidence further discloses that he had declared that the wife never should get a dime on her alimony judgment. From these and other facts appearing CT Page 1542 in the record we cannot say that the trial judge erred in refusing to discharge the husband from custody.
 In view of the large amount of alimony involved, the trial judge could well find that the application of this remedy for a period of five months was not sufficient to test the inability of the husband to pay this alimony. Id, 389.
Ms. Wiegand has testified, and the court has found, that she is disabled and that she has the ability to provide to the payors all required medical records. Further, if a medical exam is required, it can be arranged, with Ms. Wiegand's cooperation. Accordingly, she is a disabled person who can provide to her disability carriers and to Social Security the documents, and who can submit to examination, as a result of which a stream of disability benefits totalling $5,700 per month (including what is paid to Mr. Wilkinson by execution) may begin to flow to the parties. If her refusal to take the actions of which she is now capable were excused on the ground she has not taken them while incarcerated for 11 weeks, then the enforcement of financial orders in family matters would suffer a serious blow. An obligor with substantial assets need only separate herself or himself from legal title to those assets (while retaining equitable interests), suffer 11 weeks of incarceration and walk out of jail with no fear of coercion to compel future compliance, so long as legal title is not retaken.
It is held that requiring Ms. Wiegand to do those acts which she is now capable of performing, which will likely enable her able to purge, at least in part, her contempt, as a condition of her release is reasonable and appropriate. It is also held that her incarceration for 11 weeks has not destroyed the coercive effect of incarceration on her.
CONDITIONS OF RELEASE
Ms. Wiegand will be released from incarceration when each of the following has been completed, subject to any changes in these conditions which may be appropriate after further hearings:
1) All medical records and reports required by each of CT Page 1543 the payors has been provided to the payors;
2) If, after receipt of all records and reports, one or more of the payors requires a medical exam of Ms. Wiegand, she has cooperatively undergone such an exam;
3) Ms. Wiegand has executed and delivered to Mr. Wilkinson's attorney an assignment of some or all of her disability benefits from Cigna and NWM, both retroactive and prospective benefits. At the hearing scheduled on this matter on March 7, 1997, the court will hear the parties on questions, if any, as to the form of such assignments and the amounts of benefits to be so assigned. Attorney Kiefer is directed to provide, by FAX, to Attorneys Polan and Benedict, not later than 4 PM, March 4, 1997, drafts of such assignments which shall set out the amounts of benefits assigned;
4) The Social Security checks payable to Ms. Wiegand are deposited so that she can direct the immediate disbursement of their proceeds; and
5. Ms. Wiegand has executed and delivered to Mr. Wilkinson's attorney authorizations directing Senator DeKamp and Bo Gritz to provide complete disclosure to him of all of their fund raising activities related to Ms. Wiegand and/or the children. At the March 7 hearing, the court will hear the parties on questions, if any, as to the form of such authorizations. Attorney Kiefer is directed to provide, by FAX, to Attorneys Polan and Benedict, not later than 4 PM, March 4, 1997, drafts of such authorizations.
At the March 7 hearing, the court will hear any requests of the parties for modification.
G. Levine, J.